# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| AARON PETERSON,<br><br>          Plaintiff,<br><br>vs.<br><br>**XPO LOGISTICS, INC.,**<br><br>          Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17CV307DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant XPO Logistics, Inc.'s Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On October 18, 2017, the court held a hearing on the motion. At the hearing, Plaintiff was represented by Brent A. Orozco, and Defendant was represented by Robert H. Smeltzer and Vincent J. Velardo. The court took the motion under advisement. After carefully considering the parties' memoranda and the law and facts relevant to the pending motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Aaron Peterson worked for Defendant XPO until June 2015, when he left to work for Leeway Global Logistics, LLC, one of XPO's competitors in the third-party logistics business. On September 26, 2015, XPO sued Leeway and Peterson in this district, *XPO Logistics, Inc. v. Leeway Global Logistics, LLC, et al.,* No. 2:15cv703CW ("Underlying Action"). XPO's Complaint in the Underlying Action alleges that Peterson breached the confidentiality, non-solicitation and non-competition covenants of his XPO Employment Agreement. XPO also

alleged that Peterson and Leeway misappropriated XPO's trade secrets and that Leeway tortiously interfered with Peterson's XPO Employment Agreement.

Peterson brought this action against XPO for defamation, tortious interference, false light, injurious falsehood, and identity theft in connection with the publication of emails by XPO's counsel in the Underlying Action. On April 20, 2016, at a hearing on a motion to dismiss in the Underlying Action, XPO's counsel referenced "unassailable evidence from Mr. Peterson himself" that allegedly implicated Peterson in targeting XPO's employees, information, and customers in violation of his XPO Employment Agreement. On April 29, 2016, XPO's counsel sent Leeway's counsel an email, entitled "XPO v. Leeway – Inadmissible FRE 408 Discussion," that contained an email purportedly sent from Peterson to Josh Morin, dated April 19, 2016, and a reply email purportedly sent back from Morin to Peterson the same day. The first email that Peterson purportedly sent to Josh Morin states:

> Josh,
>
> As you are well aware we are in full swing with Hanjin.
>
> MTD - 65 shipments for over 123,000 in gross margin.
>
> We are being pestered for a tracking application. Do you have a go live date? I know we are waiting for Casey's contract to end with XPO before we proceeded full speed however I am wondering how much longer I can actually keep them at bay. Did you and Casey A. Come to a conclusion about a start date? Casey McKell is wanting to put some leads aside for when Casey A comes on board full steam. Will you let Casey M know how the conversation went on Friday with Casey A?
>
> Thank you.
>
> AP

The response purportedly from Morin to Peterson that same day stated:

> Aaron,

I am ecstatic to hear Hanjin is working out well for you guys.

I am not sure we are readily available to pull Casey from XPO. The new BP bonused him $30,000 with no real expectations. That will be paid up in May. We originally wanted to pull him out then but they are making more changes and I think he could continue to feed us invaluable information. When we met Friday I learned they are currently working on assigning him Campbell's and its looking to be much larger than Hanjin. To reiterate let's keep siphoning off what we can till our hand is forced they are literally clueless. Everything is in his dad's name so we aren't risking anything.

Copying in Casey McKell so he is in the loop.

JM

Peterson alleges that these emails were forged. Although they superficially appear to be real emails in a regular email format, the date on the emails state Monday, April 19, 2016, when in fact April 19, 2016, was a Tuesday. The email address for Peterson is also inconsistent in the original email and the reply, which the computer should have automatically generated to go to the same email address from which the original email was sent. In addition, the reply email appears to have been sent hours before the original email.

However, Leeway relied on the representations in these emails and believed them to be evidence of Peterson's breach of his XPO Employment Agreement. After receiving these emails through the attorneys in the Underlying Action, Leeway terminated Peterson's employment.

In the Underlying Action, the parties issued third-party discovery to Google and T-Mobile in an effort to determine the source of the allegedly forged emails. That discovery revealed nothing as to the emails' true author(s). However, because the parties questioned the emails' legitimacy, XPO did not use them as a basis for amending its Complaint in the Underlying Action.

Peterson brought the present lawsuit against XPO, alleging five causes of action relating

to the allegedly forged emails. Peterson alleges that XPO employees fabricated the emails to obtain a favorable outcome in the Underlying Action.

## DISCUSSION

### Motion to Dismiss

XPO asks the court to dismiss Peterson's Complaint arguing that Peterson's claims are barred by the judicial privilege proceeding privilege and fail as a matter of law. Peterson acknowledges that the false light claim does not state a claim and, therefore, concedes to the claim's dismissal. However, Peterson opposes the motion on all other grounds.

### 1. Judicial Proceedings Privilege

XPO argues that the court should dismiss Peterson's Complaint because his claims are barred by the judicial proceedings privilege. For the judicial proceedings privilege to apply, the statements at issue must: "(1) be made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *DeBry v. Godbe*, 1999 UT 111, ¶ 11, 992 P.2d 979.

The term "judicial proceeding" is broadly interpreted and covers defamatory statements "not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and on other communications preliminary thereto." *Id.* ¶ 12. Any communication that plays "a legitimate role in resolving the dispute between the parties" qualifies as privileged. *Pratt v. Nelson*, 2007 UT 41, 164 P.3d 366, 380.

In Utah, the policy behind the privilege is "to encourage full and candid participation in judicial proceedings by shielding the participant from potential liability." *Krouse v. Bower*, 2001 UT 28, ¶10, 20 P.3d 895, 899. "It therefore follows that the privilege must also encourage

candid, forthright settlement communications that take place prior to the filing of suit." *Id.* The "privilege is premised on the assumption that the integrity of the judicial system requires that there be free and open expression by all participants and that this will only occur if they are not inhibited by the risk of subsequent defamation suits." *Id.*; *DeBry v. Godbe*, 1999 UT 111, ¶10 ("The common law judicial proceedings privilege is intended to promote the integrity of the adjudicatory proceeding and its truth finding processes."). But the privilege is "not without its limits" nor does it offer "blanket immunity against all claims." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶37. The privilege does not shield a party from civil liability if it committed fraud or acted in bad faith. *Id.*

In this case, XPO's counsel published the allegedly forged emails only once to Leeway's counsel during the course of settlement discussions in the Underlying Action. The title of the email was "XPO v. Leeway – Inadmissible FRE 408 Discussion." Peterson argues that because the author of the emails is not known the court cannot determine whether the emails were made during the course of the litigation proceedings. However, the first element refers to whether the publication was made during the litigation proceedings. Publication of the emails occurred when the emails were forwarded to Peterson's counsel in the Underlying Action. According to Utah law, the publication of the emails during settlement discussions is within the course of the litigation proceedings.

Second, a statement must have "some relationship to the cause or subject matter involved," although it "need not be relevant or pertinent to the judicial proceeding from an evidentiary point of view for the privilege to apply." *Pratt*, 2007 UT 41 ¶30, 164 P.3d at 376. If any doubt as to the relevancy exists, it "should be resolved in favor of the statement having reference to the subject matter of the proceeding." *Id.*

Peterson alleges that the forged emails pertain to the very heart of the subject matter of the Underlying Action. Peterson's and Leeway's alleged competition with XPO and whether Peterson breached his XPO Employment Agreement is the focus of the Underlying Action. The emails would be relevant evidence in relation to the alleged causes of action in the Underlying Action. While there is a bad faith fraud exception to the application of the litigation proceedings privilege, Peterson does not assert a fraud claim. Moreover, the discovery the parties propounded in the Underlying Action in an attempt to find out the origins of the emails was inconclusive.

Finally, the email was published by someone acting in the capacity of litigant or counsel. XPO's counsel in the Underlying Action sent the emails on behalf of XPO. Peterson argues that application of the judicial proceedings privilege is premature because he has alleged that he did not draft the emails and the parties were unable to determine who drafted the emails. However, the person who drafted the email is not relevant to the publication of the email. The defamation must be judged on who actually published the statement, not the unknown alleged forger. XPO obtained the emails through Peterson's former XPO email account and XPO's counsel published the emails to opposing counsel in the Underlying Action. The identity of the person who published the email is known and it was someone acting in the capacity of counsel.

Therefore, the court concludes that the emails meet all three of the requirements for the privilege to apply. Judge Waddoups has inherent power over misconduct that occurs in the litigation before him. The parties already started pursuing the issue in the Underlying Action and Judge Waddoups' inherent power is sufficient to deal with the present circumstances.

In addition, the judicial proceedings privilege is not just applicable to Peterson's defamation claim. The privilege applies to all of Peterson's tort claims and statutory claims for

6

identity theft because all of those claims arise from the same statements. *Moss v. Parr, Waddoups, Brown, Gee & Loveless*, 2012 UT 42, ¶¶ 39-40, 285 P.3d 1157, 1167 (breach of settlement agreement, abuse of process, and invasion of privacy claims all precluded by judicial proceeding privilege). The alleged benefit or value obtained for purposes of the identity fraud claim is a better settlement in the Underlying Action, which demonstrates that the claim falls within the context of the privilege. Accordingly, the court dismisses Peterson's entire Complaint based on the judicial proceedings privilege.

## 2. Defamation

Peterson's defamation claim also fails as a matter of law because he has not and cannot allege that one or more of the email statements relating to him were actually defamatory. Not all false statements are defamatory. "An embarrassing, even though false, statement that does not damage one's reputation is not actionable as libel or slander. If no defamatory meaning can reasonably be inferred by reasonable persons from the communication, the action must be dismissed for failure to state a claim." *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988). A defamatory statement is one that "impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *Jacob v. Bezzant*, 212 P.3d 535 (Utah 2009). Whether a statement is capable of sustaining a defamatory meaning is a question of law. *West v. Thomson Newspapers*, 872 P.2d 999, 1008-09 (Utah 1994).

In Peterson's Complaint, he does not allege how the statements in the emails defame him. He concludes only that, as a whole, the emails are a false accusation that he breached his XPO Employment Agreement. The emails, however, do not include such a statement. Moreover, even if they had, he has already publicly claimed in the Underlying Action that the Employment

Agreement is unenforceable as a matter of law.  Peterson's breach of his XPO Agreement is not a necessary implication from the allegedly forged emails.  A lot of unstated facts would have to be inferred for Peterson's characterization of the forged email to amount to defamation and, even then, none of the statements expose Peterson to public hatred, contempt, or ridicule.  While Leeway believed the emails and terminated Peterson's employment, the emails did not subject Peterson to public hatred, contempt, or ridicule.  The emails were not publicly published, they were only disclosed to opposing counsel in an email marked as confidential settlement communications.  Accordingly, the court finds no basis for Peterson's defamation claim as a matter of law.

### CONCLUSION

Based on the above reasoning, Defendant XPO's Motion to Dismiss [Docket No. 14] is GRANTED.

DATED this 2d day of November, 2017.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge